## FROST *v.* ARNAUD *et al.*

1. An action to recover damages sustained by a plaintiff in consequence of fraudulent representations and concealment made by the defendant, whereby the former is induced to purchase worthless shares of stock in a corporation never legally organized, is governed by the statute of limitations appertaining to injuries to property, which is four years.

2. A plaintiff whose action is founded on actual fraud must exercise reasonable diligence to detect and discover the fraud. The allegations are insufficient to excuse the plaintiff's laches of nearly six years in bringing his suit.

3. Promoters of a corporation, fraudulently inducing subscribers to take stock in the corporation, do not stand in such fiduciary relation to such subscribers as to exclude the operation of the statute of limitations from a suit by a stockholder against them on account of the fraud.

AUGUST 13, 1915.

Equitable petition. Before Judge Ellis. Fulton superior court. January 29, 1914.

W. E. Arnaud and others brought suit against Jonathan B. Frost and J. M. Bishop of Fulton county, and Thomas J. Shanley of the State of Montana, to recover money alleged to have been paid to them by the plaintiff in connection with the promotion of a corporation. The petition (filed on September 30, 1912) alleged as follows: On September 30, 1905, Shanley entered into a contract with J. P. Brooke, whereby Brooke agreed to sell to Shanley certain described mining property located in Gwinnett county, Georgia; in which contract it was stipulated that, if the mine should be operated during a stated period, 25 per cent. of the ore mined should be paid on the purchase-price. Thereafter Shanley associated with himself Bishop and Frost for the purpose of promoting a corporation to take over the mining property under Shanley's contract, and, with certain other persons, applied for and obtained on September 20, 1906, from Fulton superior court, a charter for a corporation to be known as the Suwanee Gold Mines Company. In the application for charter it was recited that the minimum capital stock was fixed at one million dollars, divided into one million shares of the par value of one dollar each, and that ten per cent. of the capital stock, $100,000, had been actually paid in. Immediately after the procurement of the charter Frost appropriated to himself fifty thousand shares of the capital stock of the company, and afterwards received fifty thousand additional shares of stock, and Bishop appropriated to himself fifty thousand shares of the stock;

which stock was issued to Frost and Bishop in consideration of services to be performed by them in procuring sufficient capital to pay for the mining property and to begin the mining operations. Shanley appropriated to himself two hundred and twenty-five thousand shares of the stock in consideration of transferring to the corporation his rights under his contract with Brooke. In reality there was no consideration flowing to the corporation for the stock, because Frost and Bishop did not procure the capital, but only $8,152.50 thereof, including the amount received from petitioners, and because the contract itself was without market value. The "defendants entered into a conspiracy to sell to the public, including petitioners, so much additional stock as should be necessary to pay the purchase-price of said mining property under the terms of said contract between the said Brooke and said Shanley, to wit $40,000.00, and so much more of such additional or treasury stock as should be necessary to put in operation the mines on said property, to wit $10,000.00 or less, reserving to themselves enormous blocks of stock appropriated to themselves as aforesaid." For the purpose of inducing petitioners to buy stock in the corporation the defendants resorted to false and fraudulent artifices, by verbally stating to petitioners that the Suwanee Gold Mines Company owned in fee simple all of the mining property contracted to be purchased from Brooke, and that every dollar they invested would purchase its equivalent in an undivided interest in land owned by the company, exclusive of valuable gold mines thereon; by representing in the application for charter that $100,000 had been actually paid into the company's treasury; by concealing from petitioners the fact that defendants had issued to themselves three hundred and seventy-five thousand shares of stock; by dumping thousands of tons of auriferous dirt into a gulch and washing therefrom most of the sand, so that upon inspection of the property it would appear that the placer deposits of gold were much richer than in truth they were. By means of such false and fraudulent artifices your petitioners, relying thereon, on January 12, 1907, purchased from defendants one thousand shares, and paid therefor the sum of $900. Petitioners did not know of the fraud so perpetrated on them by the defendants until August 1, 1912, when Arnaud was informed by Brooke that on September 30, 1910, Frost took to himself a deed to all of the mining property which Brooke contracted to sell

to Shanley. Petitioners by the exercise of ordinary care could not have discovered the imposition so practiced upon them; and they were lulled into a sense of security by reason of the relation of trust and confidence between them and the defendants which rendered it their duty to disclose the truth. Petitioners were deterred from discovering the fraud or suspecting that any fraud had been perpetrated upon them. "Petitioner [Arnaud], often within four years next after the purchase of said stock, approached said defendants for information as to the progress said company was making in the development of its mines and business, and was at all times assured that said company would soon be paying dividends, and that the stock, including petitioner's, was constantly enhancing in value; and at all such times defendants fraudulently concealed from petitioner the truth of the matters set forth in paragraph six of this petition, notwithstanding they well knew that petitioner relied on said representations in purchasing his said stock. Petitioner entrusted defendants with his money to be used in connection with that of other subscribers whose aggregate subscriptions should amount to the capitalization required by the charter of said company in developing and putting into complete operation said mining properties; and there was no specified time in which this should be done, four years being a reasonable time therefor." The defendants were thus in possession of petitioner's money, using it, as he supposed, for his benefit in perfecting the operation of the mining property. In appropriating this money or the property improved thereby to themselves or to the defendant Frost, the defendants abused the fiduciary relation existing between petitioner and themselves; and petitioner did not know, nor by the exercise of ordinary care could he have known, that they or either of them held his money or the property improved adversely to him and the other stockholders until the year 1912, when he discovered the facts hereinbefore set forth. The stock so purchased was and is worthless, as the corporation never had any assets; nevertheless he tenders back the stock certificates issued to him. The prayer is for judgment for the money so paid, with interest thereon at the rate of seven per cent. Frost filed a demurrer on the ground that no cause of action was set out, and that the cause of action, if any, was barred by the statute of limitations. The demurrer was overruled, and Frost excepted.

*Little, Powell, Smith & Goldstein,* for plaintiff in error.

*Hines & Jordan* and *James L. Anderson,* contra.

EVANS, P. J. (After stating the foregoing facts.) According to the allegations of the petition the plaintiffs parted with their money through being fraudulently led into the purchase of stock in a corporation which was never legally organized, and was but an instrumentality devised as a part of the defendants' fraudulent scheme. The action is founded in the fraud of the defendants. Although the demurrer challenged the sufficiency of the petition as stating a cause of action, this ground of the demurrer was not argued in the brief, and will be treated as abandoned.

1. All actions for injuries to property, real or personal, shall be brought within four years after the right of action accrues. Civil Code (1910), §§ 4495, 4496. We think that an action brought to recover damages sustained by the plaintiff in consequence of fraudulent representations and concealment by the defendant, whereby the former is induced to purchase worthless shares of stock in a corporation which was never legally organized, is governed by the statute of limitations appertaining to injuries to property. *Crawford* v. *Crawford,* 134 *Ga.* 114 (67 S. E. 673, 28 L. R. A. (N. S.) 353, 19 Ann. Cas. 932); Miller *v.* Wood, 41 Hun, 600. The action was commenced more than four years after the plaintiff had parted with his money, and is barred, unless the case as alleged falls within an exception to the general rule.

2. One of the statutory exceptions to the general rule is expressed in the Civil Code (1910), § 4380: "If the defendant or those under whom he claims has been guilty of a fraud by which the plaintiff has been debarred or deterred from his action, the period of limitation shall run only from the time of the discovery of the fraud." The fraud referred to in this section as relieving the bar of the statute must be such as involves moral turpitude. *Austin* v. *Raiford,* 68 *Ga.* 201. The plaintiff's allegations make a case of actual or moral fraud. Even in cases of moral fraud, there must be reasonable diligence on the part of the plaintiff to detect or discover the fraud. "Ignorance of fraud which, by the use of ordinary diligence, might have been discovered in due time, will not hinder the statute from running." *Freeman* v. *Craver,* 56 *Ga.* 161; *Marler* v. *Simmons,* 81 *Ga.* 611 (8 S. E. 190). The defendants' statements made to induce the purchase of stock in

the corporation were so alluring that the natural cupidity of the most careless speculator would have raised an expectation of early and large returns from the investment, and would have prompted investigation as to the cause of the disappointment. The plaintiff anticipated that he reasonably might be called on to explain why he was in such laches in discovering the defendants' fraud, and assigned, as a reason why he had not called upon the officers of the company for a statement of the corporation's business, that the defendants had "often within four years next after the purchase of the stock" assured him that the company would soon be paying dividends, and that the stock was constantly enhancing in value. The time elapsing between the purchase and the filing of the suit was nearly six years. The pleader does not state that continuously during the four years after he bought his stock he applied to the defendant for information. If he had done so, he might have excused his negligence during this period. The allegation that often within four years next after the purchase of his stock he had approached the defendants for information about the corporation could be satisfied by proof that he had often made inquiries within twelve or eighteen months after his purchase, and still more than four years would have intervened before the bringing of the suit. As was well said by Judge Bleckley, in *Sutton* v. *Dye,* 60 *Ga.* 449: "Diligence to detect fraud is as much incumbent upon a party who labors under no disability as to do any other act in which his interest is involved. He must look about him, and see what villainies environ him. If he has been caught in a net, he must feel for the meshes." This plaintiff does not allege that he resided remotely from the county of the principal office of the corporation. Reasonable diligence would have required him to inquire of the officers of the corporation the condition of its affairs. This would have been the natural thing for him to have done; and if he had done so with reasonable diligence, he would have sooner ascertained whether he was the victim of a financial swindle.

3. Another reason advanced by the plaintiff as an excuse for his laches is, that a confidential relation existed between him and the defendants, inasmuch as he entrusted the defendants with his money to be used in connection with that of other subscribers, whose aggregate subscriptions should amount to the capitalization

required by the charter of the corporation, in developing and putting into complete operation the mining properties, and that four years was a reasonable time for this purpose. Promoters of a corporation have been held liable to account to the corporation for secret profits, on the theory of a trust relationship. While promoters may stand in a fiduciary position to the corporation, they do not, as a rule, occupy that position toward the subscribers for shares. Alger on Promotion of Corporations, § 127. But even if it be conceded that a sort of trust relationship is alleged, it is not an express trust, but only such as may equitably result from the facts. Resulting or implied trusts are within the statute of limitations. 25 Cyc. 1155. The relation of an officer to a corporation has been held not to be such a technical trust relationship as came within section 3782 of the Civil Code, declaring that subsisting trusts, cognizable only in a court of equity, are not within the ordinary statutes of limitation. *Knowles* v. *Rome Tribune Co.*, 127 *Ga.* 90 (56 S. E. 109). We think that the defendants and the plaintiff sustained the relation of vendor and vendee; and although the vendor was promoting a corporation in the sale of its stock, and made the representations alleged by the plaintiff, nevertheless the cause of action arising out of the transaction was barred after four years from the time it accrued.

*Judgment reversed. All the Justices concur.*